**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Bejtush Hyseni,<br><br>        Plaintiff,<br><br>v.<br><br>Penske Logistics LLC,<br><br>        Defendant. | No. CV-19-05671-PHX-DWL<br><br>**ORDER** |

Plaintiff Bejtush Hyseni ("Hyseni") alleges that his employer, Defendant Penske Logistics LLC ("Penske"), failed to pay him all of the wages he was owed and retaliated after he complained about this failure, in violation of the Arizona Wage Act ("Wage Act") and the Fair Labor Standards Act's ("FLSA") retaliation provision. (Doc. 1-3.) Now pending before the Court is Penske's motion for summary judgment. (Doc. 24.) For the following reasons, the motion is granted and this action is terminated.

**BACKGROUND**

I.    <u>Factual Background</u>

The following facts are derived from evidence submitted alongside the parties' summary judgment briefing. The facts are undisputed unless otherwise noted.

Penske is a national provider of logistical and supply chain management services. (Doc. 24-2 at 2 ¶¶ 2-4.) Hyseni started driving trucks for Penske in November 2016. (*Id.* at 3-4 ¶ 9.) Depending on the job, Hyseni might be paid hourly or based on mileage and stops. (*Id.*) On June 25, 2018, Hyseni began working on Penske's Trader Joe's account.

(*Id.*)  From June 25, 2018 to November 10, 2019, Penske paid Hyseni at a rate of $20.50 per hour.  (*Id.* at 4 ¶ 10.)  By October 2018, he was paid on an hourly basis only.  (*Id.*)[1] The amount of work available to Hyseni on the Trader Joe's account fluctuated "from month-to-month, week-to-week, and even day-to-day." (*Id.* at 4 ¶ 13; *id.* at 12-13.)

Hyseni contends, and Penske disputes, that when he was moved to the Trader Joe's account, he was guaranteed a minimum of 60 hours of work per week.  (Doc. 25-2 at 1, 8, 16-18, 24-25.)  Hyseni further contends this promise exists in writing, but only Penske has the written document.  (*Id.* at 28, 79.)  Hyseni testified in his deposition that he would not have agreed to work on the Trader Joe's account if he hadn't been guaranteed at least 60 hours of work per week.  (*Id.* at 30.)

Hyseni further contends, and Penske disputes, that Penske management would alter the number of driving hours he recorded in his driving logs on various days to make it appear as though he and Penske were in compliance with U.S. Department of Transportation ("DOT") regulations setting the maximum number of hours a commercial driver may drive in one day.  (*Id.* at 36-38.)  Hyseni describes this scheme as a cooperative one between himself and management.  (*Id.* at 39.)  For instance, if Hyseni were in Tucson on a delivery, but had already driven the maximum number of hours that day, he would call a manager, who would instruct him to log out of the timekeeping system and then log herself in to set his clock-in time to two hours later than it actually was (say, from 4:00 a.m. to 6:00 a.m.) so that Hyseni could make the return trip to Phoenix without exceeding the maximum hours.  (*Id.* at 39-40.)  Hyseni contends this hour-tinkering happened "hundreds of times."  (*Id.* at 72.)  It appears, based on Hyseni's deposition testimony and response to summary judgment, that Hyseni's theory is that this scheme was at least in part what caused him not to be paid for the correct number of overtime hours worked.  (Doc. 25 at 9; *see generally* Doc. 25-2 at 35-40, 47-48, 56-58, 60-61.)

An important part of the parties' dispute on summary judgment centers on how, and using what platform, Hyseni logged his driving hours.  One of the platforms, "Cellcomm,"

---

[1]  Hyseni has since moved to a non-hourly position.  (Doc. 24-2 at 4 ¶ 12.)

is the platform that Hyseni used to log his working hours. (Doc. 25-2 at 43-44.) Cellcomm is housed on a cell phone that Hyseni would carry with him as he worked. (*Id.* at 46, 48.) He would clock in and out every day on Cellcomm and he would be paid based on the hours logged on the app. (Doc. 24-2 at 234; Doc 25-2 at 51-52.) Meanwhile, the so-called "XRX"[2] platform, which would log the number of hours that Hyseni was driving, rather than simply on the job (as some of Hyseni's work involved tasks besides driving the vehicle), was used to report the number of hours Hyseni drove for DOT compliance purposes. (Doc. 24-2 at 228; Doc. 25-2 at 73.)

Hyseni contends that, beginning in August 2018, between 10-20 hours of his working time went unrecorded every week. (Doc. 25-2 at 56-57.) Hyseni asserts that his timecards, driver logbooks, and trip sheets did not match up. (*Id.* at 57.)

Also in August 2018, Hyseni started to complain that he was not being paid correctly for the overtime hours he worked. (*Id.* at 33-34.) His concerns were not addressed to his satisfaction, and in March 2019 he threatened that he would sue Penske. (*Id.* at 35.)

On July 8, 2019, after complaining about these issues for months and not getting what he believed to be a satisfactory response, Hyseni filed suit. *Hyseni v. Penske Logistics LLC*, 2:19-cv-04663 (D. Ariz. July 8, 2019), Doc. 1.[3] However, Hyseni voluntarily dismissed the suit on September 25, 2019. *Id.* at Docs. 16, 17. Hyseni asserts that in retaliation for filing that lawsuit, his hours were cut and Penske put cameras in his truck that monitor him 24 hours per day. (Doc. 25-2 at 66, 68.) This led Hyseni to file a second suit, which is this case. (*Id.* at 68.)

…

---

[2] According to Penske, the system is actually called "XRS" (Doc. 26 at 1 n.1), but both parties refer to it as XRX and the Court follows suit.

[3] Neither party attached any evidence of this lawsuit other than reference to the case's docket. (Doc. 24 at 7; Doc. 25 at 2.) The existence of the July 2019 lawsuit is subject to judicial notice and may be considered when resolving the motion for summary judgment. *United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) ("[W]e 'may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue.'") (citation omitted); *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) ("[Courts] may take judicial notice of court filings and other matters of public record.") (citation omitted).

II. <u>Procedural History</u>

On October 11, 2019, Hyseni filed the complaint in Maricopa County Superior Court. (Doc. 1-3.)

On November 22, 2019, Penske removed the action to this Court. (Doc. 1.) The parties then engaged in discovery, which closed on July 10, 2020. (Docs. 8-19.)

On October 2, 2020, Penske filed the motion for summary judgment. (Doc. 24.) The motion is now fully briefed. (Docs. 25, 26.)[4]

## DISCUSSION

I. <u>Legal Standard</u>

"The court shall grant summary judgment if [a] movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014). The court "must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inference in the nonmoving party's favor." *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018). "Summary judgment is improper where divergent ultimate inferences may reasonably be drawn from the undisputed facts." *Fresno Motors*, 771 F.3d at 1125 (internal quotation marks omitted).

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "In order to carry its burden of production, the moving party must either produce evidence negating an essential element

---

[4] Penske requested oral argument (Doc. 24), but that request is denied because the issues have been fully briefed and oral argument will not aid the Court's decision. *See* Fed. R. Civ. P. 78(b); LRCiv 7.2(f).

of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). "If . . . [the] moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Id.* at 1103.

"If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Id.* There is no issue for trial unless enough evidence favors the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted). At the same time, the evidence of the non-movant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254. Thus, "the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant." *Id.* at 255.

II.   Analysis

  A.   **Wage Act Claim**

Count One of the complaint asserts a violation of the Wage Act. (Doc. 1-3 at 3 ¶¶ 13-19.) This claim is predicated on the allegation that, from late August 2018 to early April 2019, Hyseni worked well over 40 hours per week pursuant to Penske's promise that, after he moved to the Trader Joe's account, he would work at least 60 hours per week and be paid at 1.5 times his normal wage for overtime hours. (*Id.* at 3 ¶¶ 8-9.) Hyseni acknowledges that Penske generally paid him for ten or twenty hours of his overtime work but contends Penske "failed or refused to pay [him] wages for all of the hours over forty hours per week that [he] worked." (*Id.* at 3 ¶ 10.) Hyseni asserts that under the Wage Act, he "had a reasonable expectation that Penske would pay him wages at 1.5 times his regular

rate of pay for all hours he worked over forty hours in a week," that "Penske failed or refused to pay [him] all the wages due him," and that Penske "had no reasonable, good faith basis for withholding payment of [his] wages." (*Id.* at 3 ¶¶ 16-18.)

In its summary judgment motion, Penske makes three arguments. First, Penske asserts that a one-year statute of limitations applies to Hyseni's Wage Act claim, meaning any claims arising before October 11, 2018 (one year before Hyseni filed the complaint) are time-barred. (Doc. 24 at 7-8.) Second, Penske argues that, to the extent Hyseni claims he is owed damages under the Wage Act for weeks he worked fewer than 60 hours (because Penske had promised him at least 60 hours of work per week), this is not a viable Wage Act theory, because "the Wage Act provides a cause of action for unpaid wages related to work the employee actually performed; it does not provide a cause of action for an employer's alleged unfulfilled promise that an employee will have an opportunity to perform work." (*Id.* at 8-9.) Third, Penske argues that Hyseni has proffered no evidence demonstrating that he was insufficiently paid for the hours he actually worked, because he admitted during his deposition that he "accurately recorded his work hours with his Cellcomm punches" and he received overtime pay consistent with the hours recorded in Cellcomm. (*Id.* at 9.)

Hyseni responds as follows. First, Hyseni acknowledges his claims are subject to a one-year statute of limitations but argues his claims are subject to equitable tolling in light of his July 2019 lawsuit. (Doc. 25 at 7-9.) Second, Hyseni argues he reasonably relied on Penske's promise of at least 60 hours of work per week and that Penske's "failure to abide by their own agreement is a violation" of the Wage Act and also violates the implied covenant of good faith and fair dealing. (*Id.* at 5-7.) Third, Hyseni argues that because his deposition testimony and responses to Penske's requests for admission create a factual dispute over whether he was in fact paid appropriately for all hours worked, summary judgment on this issue is improper. (*Id.* at 9.)

Penske replies that equitable tolling does not apply in this case, binding Ninth Circuit precedent forecloses Hyseni's argument that he can recover for Penske's failure to

provide him with 60 hours of work per week, and there is no genuine dispute about whether Hyseni was ever not paid for all hours worked. (Doc. 26 at 1-6.)

### 1. Promise To Work 60 Hours Per Week

During his deposition, Hyseni repeatedly emphasized that when he was moved to the Trader Joe's account, he was promised at least 60 hours of work per week. (*See, e.g.*, Doc. 25-2 at 1, 8, 16-18, 24-25, 28, 30, 79.) And in his summary judgment response brief, Hyseni argues that Penske's failure to fulfill this promise constitutes "a violation of the Arizona Wage Act and an adverse employment action." (Doc. 25 at 6.)

This argument fails for the simple reason that a plaintiff cannot prevail on a Wage Act claim under the theory that he wasn't given the opportunity to work as many hours as promised. In *Nieto-Santos v. Fletcher Farms*, 743 F.2d 638 (9th Cir. 1984), the Ninth Circuit reviewed Arizona case law and held that the district court had been "clearly correct" in interpreting the Wage Act as providing recovery only on "compensation due an employee for work *performed*." *Id.* at 642 (internal quotation marks omitted). Thus, the plaintiffs in that case could not recover "damages for the balance of the contract term during which they were not permitted to work." *Id.* In other words, a Wage Act plaintiff cannot recover money based on work that he wishes he'd had the opportunity to perform or was promised the opportunity to perform—instead, recovery is limited to "wages for work already performed." *Id.* This forecloses Hyseni's theory that he can recover money for weeks he did not have the opportunity to work at least 60 hours. *See also Schade v. Dietrich*, 760 P.2d 1050, 1062 (Ariz. 1988) ("By its terms, the statute subjects an employer to treble damages for failing to pay nondiscretionary compensation for labor or services *actually performed* and for which the employee had a reasonable expectation . . . .") (emphasis added); *Thompson v. Apache County*, 2011 WL 5547981, *10 (D. Ariz. 2011) (granting summary judgment for defendant where plaintiff sought payment for hours not worked and admitted that he had been timely paid for hours actually worked); *Ufheil v. Carraba's Italian Grill, LLC*, 2011 WL 3665382, *3 (D. Ariz. 2011) ("Given that Plaintiff's complaint appears to seek damages for work not yet completed, [the Wage

- 7 -

Act's] treble damages provision is not applicable to this case . . . .").

Notably, although Penske offered an extensive discussion of *Nieto-Santos* and its progeny in the summary judgment motion, Hyseni did not acknowledge this line of precedent (much less attempt to distinguish it) in his response brief. This is not a helpful or appropriate strategy. *Cf. Borowski v. DePuy, Inc.*, 850 F.2d 297, 304 (7th Cir. 1988) (criticizing "the ostrich-like tactic of pretending that potentially dispositive authority against [a party's] contention does not exist") (citation and internal quotation marks omitted). At any rate, Hyseni's Wage Act theory of recovery here is substantially identical to the Wage Act theories that were rejected in the cases cited above and it fails for the same reasons.

Finally, the Court also rejects Hyseni's alternative theory that Penske's failure to give him 60 hours of work per week violated "the covenant of good faith and fair dealing that is implied in all contracts including employment contacts." (Doc. 25 at 6-7.) This claim does not appear in the complaint, which expressly styled Count One as a statutory claim under the Wage Act (Doc. 1-3 at 3 ["Count One (Wage Claim Pursuant to A.R.S. 23-350 et seq"], not a common-law breach of contract claim. A defendant is not put properly on notice of a claim where it is not pled in the complaint and is raised for the first time in response to a summary judgment motion. *Paralyzed Veterans of Am. v. McPherson*, 2008 WL 4183981, *10 (N.D. Cal. 2008). *Cf. Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) ("Wasco therefore may not toll the statute of limitations based on its allegations of civil conspiracy, which appear for the first time in its response to the summary judgment motion. . . . Simply put, summary judgment is not a procedural second chance to flesh out inadequate pleadings.") (internal quotation marks omitted). *See also Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("Gilmour may not raise a contractual claim in her opposition to Gates' summary judgment motion. Gates had no notice of a contract claim based on the tort claims set forth in the complaint. Liberal pleading does not require that, at the summary judgment stage, defendants must infer all possible claims that could arise out of facts set forth in the

complaint."); *Ziptronix, Inc. v. Omnivision Techs., Inc.*, 71 F Supp. 3d 1090, 1099 (N.D. Cal. 2014) ("A plaintiff cannot raise a claim for the first time in response to a motion for summary judgment.").

### 2. Non-Payment For Work Performed

Penske argues Hyseni has no evidence that he was insufficiently paid for work actually performed. (Doc. 24 at 9.) Penske further argues that Hyseni admitted during his deposition that he recorded all of his time accurately in the Cellcomm system and that Penske paid him according to the time recorded in Cellcomm. (*Id.* at 4-7, 9.)

Hyseni disputes that all of his hours were in fact accurately recorded, contending his "hours were often changed by [Penske]." (Doc. 25 at 9.) Hyseni cites his own deposition testimony wherein he claims that his managers would reduce the number of hours recorded on Penske's drive-logging system to circumvent DOT regulations. (Doc. 25-2 at 61-62, 70-76.) As noted above, Hyseni's theory seems to be that in order to allow him to return home after having already driven the maximum number of hours permitted by DOT regulations, Penske managers regularly would go into Hyseni's driving log and reduce the number of hours by 1-4 hours so he could make the return trip without appearing to violate the regulations. Then, the theory seems to be, Penske would pay Hyseni for the amount of hours that appeared in the logs, rather than the longer hours he actually worked but did not report in order to avoid regulatory scrutiny.

Penske replies that it uses separate time-logging systems for paying employees and complying with DOT regulations. Thus, it argues, even if Penske *did* alter the regulatory records (Penske disputes that it did so), this would not affect the number of hours logged for payment purposes. (Doc. 26 at 4 & n.4.) Accordingly, Penske argues, Hyseni's assertions about the hours being changed are irrelevant to the Wage Act claim. (*Id.* at 4-6.) Further, Penske contends, Hyseni's assertions about his work hours are vague, generalized, and lacking in supporting documentation—he has not identified a single concrete instance in which his hours were inaccurately recorded, leading to less pay than he earned, or where his hours *were* recorded accurately but Hyseni nevertheless received

less pay than he should have. (*Id.*) Thus, Penske argues, there is insufficient evidence in the record for there to be a genuine issue of material fact on whether Hyseni was paid properly for the hours he worked.

Penske is entitled to summary judgment on the underpayment-for-actual-hours-worked component of Hyseni's Wage Act claim. Penske attached its wage policy and over one hundred pages of earnings statements and reports showing Hyseni's pay during the relevant time period (Doc. 24-2 at 16-187), painstakingly set out how Hyseni's pay was calculated, and swears that these calculations are correct. (Doc. 24 at 4-6; Doc. 24-2 at 16-23.) This suffices for Penske to carry its initial burden of production under *Celotex*, and therefore Hyseni as the nonmoving party was required to produce evidence to support his claim. *Nissan Fire & Marine Ins. Co.*, 210 F.3d at 1103. Hyseni's responsive evidence must be enough to create a genuine of material fact. *Id.* If it is "merely colorable" or "not significantly probative" then summary judgment is proper. *Anderson*, 477 U.S. at 249-50.

Hyseni attaches two categories of evidence to his response: his own deposition testimony and dozens of photocopies of driver's vehicle inspection reports from July and August 2018. (Docs. 25-2, 25-3, 25-4.) He also points to denials he submitted in response to Penske's request for admissions. (Doc. 25 at 9.) This evidence is insufficient to avoid summary judgment, even when the Court, as it must, views it in the light most favorable to Hyseni and draws all reasonable inferences in his favor.

First, Hyseni's denials of Penski's requests for admissions (Doc. 24-2 at 7-14) are not sufficient to create a genuine dispute of material fact, because "[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 381 (2007). *See also Est. of Tucker v. Interscope Records, Inc.*, 515 F.3d 1019, 1033 n.14 (9th Cir. 2008) ("To defeat a summary judgment motion, . . . [t]he non-moving party must establish the existence of a genuine factual dispute on the basis of admissible evidence; bare allegations without evidentiary support are insufficient to survive summary judgment."). *Cf. Deakins v. Pack*, 957 F. Supp. 2d 703, 742 (S.D. W. Va. 2013) ("Defendants' simple denial [of a

1   request for admission on liability] is not sufficient to show that they are entitled to judgment
2   as a matter of law."). Additionally, Hyseni's denials are not supported by any evidence in
3   the record beside his own deposition testimony, which, as discussed below, is vague,
4   conclusory, and—like the denials themselves—unsupported by (and sometimes
5   contradicted by) other evidence in the record. The denials do not weigh against granting
6   summary judgment in this case.

7   As for Hyseni's deposition testimony, it shows, at most, that Hyseni subjectively
8   believes he was not paid all of the wages he was due. But Hyseni's strident position that
9   he was underpaid, standing alone, is merely colorable evidence and is not sufficiently
10  probative because it is vague, conclusory, and unsupported by other evidence in the record.
11  For example, Hyseni testified that one of his managers "never pays me" and that "I never
12  got paid. You can check my pay stubs." (Doc. 25-2 at 7.) Although Hyseni mentions the
13  pay stubs, they are not attached to his response. This is improper. *See, e.g.*, *Connick v.
14  Teachers Ins. and Annuity Ass'n of Am.*, 784 F.2d 1018, 1020 (9th Cir. 1986) ("A party
15  may not defeat a summary judgment motion by reference to 'phantom' documents not
16  supplied to the court."); Fed. R. Civ. P. 56, advisory committee's note to 2010 amendment
17  ("Materials that are not yet in the record—including materials referred to in an affidavit or
18  declaration—must be placed in the record."). His allusions to not being paid are also
19  vague—it is unclear when this incident of nonpayment occurred and what underlying facts
20  support the nonpayment, other than the unproffered pay stubs. (The copious earnings
21  statements Penske attached to its motion for summary judgment (Doc. 24-2 at 28-179) do
22  not show, as far as the Court can tell, that Hyseni was ever underpaid, and Hyseni does not
23  point to any of the earnings statement documents as evidence of underpayment.) Later,
24  Hyseni testified that his supervisors repeatedly acknowledged that he was being underpaid
25  and promised to eventually pay him the full amount, which they never did. (*See, e.g.*, Doc.
26  25-2 at 33-34.) But Hyseni fails to state how or why his managers thought he was being
27  underpaid. For instance, it is unclear, based on Hyseni's testimony, whether he is referring
28  to being underpaid for hours worked, or not getting enough hours to work (which, as

1 discussed above, is not an actionable Wage Act theory), or some combination. Ultimately,
2 Hyseni's deposition testimony on these points amounts to a number of vague, conclusory,
3 and unsupported assertions of nonpayment. (*See, e.g.*, Doc. 25-2 at 9, 22.) This evidence
4 might be "colorable," but it cannot defeat summary judgment where Penske has attached
5 authentic pay documents, laid out careful calculations to show the manner in which Hyseni
6 was accurately paid for time worked, and identified other instances (discussed below)
7 where Hyseni seemed to concede that he *was* paid for all of his overtime work. As noted,
8 the "mere existence of *some* alleged factual dispute will not defeat an otherwise properly
9 supported motion for summary judgment." *Scott*, 550 U.S. at 380.

10 As noted, Penske proffered evidence that Hyseni made two important concessions.
11 First, during his deposition, Hyseni acknowledged that he regularly and accurately logged
12 his hours in the Cellcomm system, that Cellcomm was the basis for his pay, and that only
13 on two occasions were there issues with this system, which Penske quickly resolved in
14 each case. (Doc. 24-2 at 226-28, 231-36.) This Hyseni's already unsupported assertions
15 that he was not paid for hours worked. Second, relatedly, Hyseni admitted in an
16 interrogatory response that his Cellcomm time was "logged accurately," while his "Driver
17 Logbook" in the XRX system was not logged accurately. (Doc. 24-2 at 243.) This,
18 combined with the first admission, suggests that he was paid for hours actually worked: if
19 Cellcomm hours were accurately recorded, and Cellcomm hours were the basis for his pay,
20 then Hyseni was paid accurately. In short, Hyseni's deposition testimony, on which Hyseni
21 substantially relies to survive summary judgment, either does not rise beyond colorable
22 evidence or, in some places, affirmatively undermines Hyseni's case, especially when
23 viewed in light of his interrogatory responses.

24 The final category of evidence proffered by Hyseni is a large collection of driver's
25 vehicle inspection reports, which are forms that have been penciled in with mileage and
26 other information. (Docs. 25-3, 25-4.) Hyseni points to this evidence once in his response
27 brief, as supposed support for the assertion that "the paychecks simply do not match
28

Plaintiff's trip sheets that he recorded on a daily basis." (Doc. 25 at 12.)[5] Unfortunately, Hyseni does not provide further elaboration on how the driver's vehicle inspection reports demonstrate this fact—they show the mileage driven on a given day but do not, at least so far as the Court can tell, state the number of hours. This omission is problematic for Hyseni because the basis for his wage claim is that he did not receive the correct *hourly* compensation during the relevant time period—hours worked, rather than mileage driven, was the basis of his pay, so the mileage driven on each day says little about Hyseni's proper payment on that day. (Doc. 1-3 at 3 ¶¶ 8-11, 16-17; *see also* Doc. 25 at 2-3 [setting out, in response to summary judgment, Hyseni's theory that he was not paid at his proper hourly overtime rates during the relevant time period].) Other problems with the reports include that they all date from July and August 2018, while Hyseni alleges the underpayment began in August 2018 and ran through April 2019. Further, different reports appear to have been completed by different people, as the handwriting and signatures on the reports vary from report to report. (*Compare* Doc. 25-3 at 1 *with id.* at 3-4.) It is accordingly not clear that all of these reports record Hyseni's trips, or if they record a mixture of Hyseni's and other drivers' trips. Hyseni does not explain in his brief or via a sworn declaration what these reports mean or why they should be taken as authentic. For all these reasons, the reports are not probative of Hyseni's Wage Act claims (to put it mildly).

In sum, because Hyseni's failed to proffer sufficient evidence in response to Penske's amply supported motion for summary judgment, his Wage Act claim fails. On this record, no reasonable juror could find for Hyseni.[6]

B. **FLSA Retaliation Claim**

Hyseni's final claim is for FLSA retaliation. (Doc. 1-3 at 4.) In the complaint, Hyseni alleges that he brought a separate lawsuit against Penske on July 8, 2019 for failure to pay overtime wages under the FLSA, which constituted protected activity, and Penske

---

[5] This argument is made in the section of Hyseni's response brief addressing the FLSA retaliation claim, not the Wage Act claim.

[6] Because Hyseni did not proffer sufficient evidence to defeat summary judgment on the merits of the Wage Act claims, the Court need not consider Penske's alternative request for partial summary judgment on statute-of-limitations grounds.

then retaliated against him by engaging in the "adverse employment action" of "drastically reducing [his] hours." (*Id.* at 4 ¶¶ 21-24.) In his summary judgment response, Hyseni identifies two additional adverse employment actions to which he was allegedly subjected—"failure of payment for all hours worked" and "having a camera placed in the cab of his work vehicle." (Doc. 25 at 12.)

Penske moves for summary judgment on this claim, arguing that (1) under the applicable burden-shifting framework of *McDonnell Douglas*, Hyseni has not established a prima facie retaliation case; (2) alternatively, even if Hyseni had established a prima facie case, Penske has demonstrated that it had legitimate reasons for undertaking the allegedly adverse employment actions; and (3) there is no evidence the actions were pretextual. (Doc. 24 at 10-15.)

In response, Hyseni disputes each of these points. (Doc. 25 at 10-13.) Penske replies that Hyseni has not raised genuine disputes of material fact and has not offered evidence to support the existence of any dispute. (Doc. 26 at 6-10.)

Under 29 U.S.C. § 215(a)(3), it is unlawful to retaliate against an employee because the employee complained about FLSA violations. To establish a prima facie case of retaliation, a plaintiff must show (1) the plaintiff engaged in FLSA-protected conduct, or the employer erroneously believed the plaintiff engaged in such conduct; (2) the plaintiff suffered an adverse employment action; and (3) there was a causal link between the protected activity and the adverse action. *Mayes v. Kaiser Found. Hosps.*, 917 F. Supp. 2d 1074, 1080 (E.D. Cal. 2013). *See also Ader v. SimonMed Imaging Inc.*, 465 F. Supp. 3d 953, 975-76 (D. Ariz. 2020) (articulating same test). The evidentiary burden to establish a prima facie case "on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994). A plaintiff must only produce "very little" evidence that "gives rise to an inference of unlawful" retaliation. *Id.* "If a plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the defendant to provide a legitimate, nonretaliatory reason for the adverse employment action." *Ader*, 465 F. Supp. 3d at 976. *See also Spata v.*

*Smith's Food & Drug Ctrs., Inc.*, 253 F. App'x 648, 649 (9th Cir. 2007) (*McDonnell Douglas* burden-shifting framework may be applied to FLSA retaliation claims regardless of whether evidence of retaliatory motive is direct or circumstantial). If a defendant provides a legitimate, nonretaliatory reason for the action, the burden shifts back to the plaintiff to show the proffered reason is pretextual. *Ader*, 465 F. Supp. 3d at 976.

### 1. Prima Facie Burden

Penske argues that Hyseni has failed to meet his prima facie burden on all three prongs of the *McDonnell Douglas* test. (Doc. 24 at 10-14.) Hyseni responds that he has met his burden. (Doc. 25 at 10-12.) The Court concludes that, even assuming that Hyseni's filing of the July 2019 lawsuit qualifies as "protected activity" and that the three forms of retaliation identified in Hyseni's complaint and summary judgment papers (*i.e.,* reduced hours, non-payment for work, and having a camera placed in one's work vehicle) all qualify as "adverse employment actions," Hyseni has failed to meet his prima facie burden because he has failed to establish a causal link between the alleged protected activity and the alleged adverse actions.

The causal link between the protected activity and the adverse employment action "can be inferred from circumstantial evidence such as the employer's knowledge of the protected activities and the proximity in time between the protected activity and the adverse action." *Dawson v. Entek Int'l*, 630 F.3d 928, 936 (9th Cir. 2011). However, "it is causation, not temporal proximity itself, that is an element of [a] plaintiff's *prima facie* case." *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 895 (9th Cir. 2005) (internal quotation marks omitted). Thus, whether there was a causal link is a "highly context-specific" inquiry. *Id. See also Ader*, 465 F. Supp. 3d at 976 (applying *Dawson* and *Porter* to FLSA claim). The plaintiff's prima facie causation burden "is much less stringent than the 'but-for' causation that a jury must find." *McNicol v. DMB Sports Club LP*, 2020 WL 1323143, *4 (D. Ariz. 2020).

Penske argues that Hyseni does not explain any connection between the filing of his July 2019 lawsuit and the alleged adverse employment actions, and therefore he has failed

to meet his prima facie burden. (Doc. 24 at 14.) Hyseni responds that the alleged reduced work hours, nonpayment for all hours worked, and camera installation occurred after Hyseni filed his FLSA lawsuit and therefore must have resulted from the filing. (Doc. 25 at 12.) In support, Hyseni points to passages of his deposition testimony wherein he generally asserts that these actions took place as a result of his earlier lawsuit and complaints about nonpayment. (Doc. 25-2 at 26-27, 30-32, 68-79.) In reply, Penske argues that Hyseni's deposition testimony fails to provide "a clear causal link" between the July 2019 lawsuit and the allegedly adverse employment actions because he does not identify a precise date on which the allegedly adverse employment actions occurred and some of his cited testimony suggests the adverse actions occurred *before* he filed the lawsuit. (Doc. 26 at 8-9.)

Hyseni has failed to demonstrate a causal link even under the forgiving prima facie standard. As with his nonpayment-for-work evidence, Hyseni relies heavily on his own deposition testimony, which merely demonstrates that Hyseni has a generalized impression that he was being retaliated against for filing his first lawsuit and fails to specify, with any clarity, what actions were actually taken against him in retaliation or when the adverse actions occurred.

For example, Hyseni testified that he was given different work assignments after he filed the first lawsuit. (Doc. 25-2 at 26-27.) But the nature of these different work assignments is unclear, and nowhere in Hyseni's summary judgment briefing does Hyseni otherwise articulate that these assignments form the basis of his retaliation claim. Hyseni also testified that Penske cut his hours at some point after his first lawsuit was filed, leading to his desire to file the instant case. (*Id.* at 30-32.) But Hyseni never articulates exactly when this occurred: he states at one point that this occurred in April 2019 (before the first lawsuit was filed) and at another point that it occurred in September 2019, and at another point that it occurred at some unidentified time period after the filing of the first lawsuit. (*Id.* at 30-32, 68.) He also testified generally about not being paid for all of the hours he worked over the course of his employment with Penske, without drawing any connection

between this underpayment and the filing of the July 2019 lawsuit or asserting that this problem began or worsened after he filed the lawsuit. (*Id.* at 69-79.) This type of *ipse dixit* testimony, which is vague, conclusory, and unsupported by any other evidence, does not suffice to show causation. Although Hyseni's testimony, taken as true, suggests that some of the complained-of conduct occurred after the filing of the July 2019 lawsuit, "the mere fact that an adverse action follows a protected activity is not sufficient evidence of retaliation to survive a motion for summary judgment." *Justice v. Rockwell Collins, Inc.*, 117 F. Supp. 3d 1119, 1138 (D. Or. 2015), *aff'd* 720 F. App'x 365, 366 (9th Cir. 2017) ("The district court properly granted summary judgment . . . because Justice failed to raise a triable dispute as to whether there was a causal connection between any protected activity and an adverse action."). Hyseni has not proffered any evidence of a causal link besides vague and confusing assertions about adverse actions possibly occurring after the filing of his first lawsuit, and this alone does not suffice.

2. <u>Legitimate Reason For Alleged Adverse Employment Action</u>

Alternatively, even if Hyseni had met his prima facie burden, which would have shifted the burden to Penske to provide a legitimate, nonretaliatory reason for the adverse employment actions, Penske has met that burden by introducing a substantial amount of evidence. The evidence demonstrates: (1) there was no significant reduction in Hyseni's hours after he filed his FLSA complaint (Doc. 24-2 at 21-22 ¶¶ 14-20); (2) to the extent there was any reduction in hours, it resulted from the undisputed fact that work on the Trader Joe's account fluctuates on a monthly, weekly, and even daily basis according to client need (*id.* at 4 ¶ 13, 12-13); (3) the legitimacy and nonretaliatory nature of this work fluctuation is demonstrated by Hyseni's standing as the first- or second-most active driver on the Trader Joe's account (because even if Hyseni's hours declined slightly in real terms, they remained well above-average in relative terms, which contradicts the notion that Hyseni was being retaliated against) (*id.* at 13, 21-22 ¶¶ 14-20); (4) the installation of the SmartDrive cameras in Hyseni's truck was done pursuant to a nationwide program for the legitimate reason of improving Penske's drivers' safety (*id.* at 4 ¶¶ 14-15); and (5) the

consequences of the SmartDrive program have been a number of coaching/counseling sessions about improving driver safety, which do not qualify as adverse employment actions and in any event are legitimate and nonretaliatory (*id.* at 5 ¶¶ 19-21, 247-48). Hyseni nowhere disputes the accuracy or authenticity of this evidence.[7]

### 3. Pretext

Because Penske has met its burden to show a legitimate, non-retaliatory reason for the alleged adverse actions, the burden shifts back to Hyseni to show that Penske's proffered reasons are pretextual.[8]

A plaintiff "can prove pretext in two ways: (1) 'indirectly by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable,' or (2) directly, 'by persuading the court that a discriminatory reason more likely motivated the employer.'" *Bowen v. M. Caratan, Inc.*, 142 F. Supp. 3d 1007, 1025 (E.D. Cal. 2015) (quoting *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1062 (9th Cir. 2002)). This requires "specific, substantial evidence of pretext," such as "discriminatory or retaliatory statements or actions by the employer," or "specific and substantial facts" demonstrating that the employers actions were inconsistent or not believable. *Id.* (internal quotation marks omitted).

In arguing for pretext, Hyseni nakedly asserts that Penske "had no legitimate business reason that explains the failure to pay Defendant for all hours worked over 40 hours a week, reducing Plaintiff's hours or installing a camera in the cab of Plaintiff's truck after he filed a lawsuit for non-payment of wages." (Doc. 25 at 12.) As for the SmartDrive program, Hyseni does not dispute that it is a national program aimed at increasing the safety of all Penske drivers—the totality of his pretext argument is to note that the nationwide program was applied to him "only after Plaintiff filed a lawsuit." (*Id.* at 12-13.) Moreover, the only evidence cited to support any of these arguments is two pages of Hyseni's

---

[7] Furthermore, to the extent Hyseni's theory is that one of the adverse employment actions was non-payment for work performed, there is no evidence of such non-payment, as discussed in Part II.A.2 *supra*.

[8] All of this assumes, of course, that Hyseni met his prima facie burden in the first instance, which is not the case.

deposition testimony describing cameras being installed in the truck. (*Id.*; Doc. 25-2 at 65-66.)

These arguments, and the scant evidence supporting them, are insufficient for Hyseni to carry his burden of showing pretext. Hyseni does not substantively engage with the evidence or point to any evidence that casts doubt on the legitimate reasons Penske proffers for the allegedly adverse actions. He has therefore not demonstrated that Penske's explanation is not believable or shown that Penske's actions were more likely motivated by a desire to retaliate. Plaintiffs that have shown pretext in other cases have offered far more than what Hyseni offers here. *Compare Ader*, 465 F. Supp. 3d at 977-78 (burden on pretext carried where plaintiff offered evidence that factually undermined defendant's purported bases for termination and showed that he received positive performance evaluations and a promotion just before termination); *Bowen*, 142 F. Supp. 3d at 1026-28 (burden on pretext carried where witness testimony contradicted defendant's asserted non-retaliatory bases for termination and where other evidence suggested that one purported basis for termination was "demonstrably false").

At best, in arguing for pretext, Hyseni asserts that pretext can be inferred because at least some of the allegedly adverse actions took place after his filing of the July 2019 lawsuit. But temporal proximity between the actions and the protected activity does not establish pretext on its own. *Cf. Behan v. Lolo's Inc.*, 2019 WL 1382462, *5-6 (D. Ariz. 2019) ("The Court is unpersuaded by Plaintiff's argument that the 'very close' timing between her break requests, discrimination charge, and eventual termination suffices to defeat summary judgment. . . . Though the timeline is certainly suggestive, Plaintiff's admission that she photographed customer information without permission raises questions of motive that temporal proximity alone cannot overcome."); *Yount v. Regent Univ., Inc.*, 2009 WL 995596, *8 (D. Ariz. 2009) ("[T]emporal proximity standing alone is not sufficient to raise a genuine issue with respect to pretext.").

Thus, even if Hyseni were found to have met his prima facie burden, Penske has carried its burden to show a legitimate, non-retaliatory reason for the complained-of actions

- 19 -

and Hyseni has failed to carry his burden to show these reasons are pretextual.

Accordingly,

**IT IS ORDERED** that Penske's motion for summary judgment (Doc. 24) is **granted**. The Clerk of Court shall enter judgment accordingly.

Dated this 2nd day of August, 2021.

Dominic W. Lanza
United States District Judge